# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| KENDELL KAY CANNY, <br><br> Plaintiff, <br><br> vs. <br><br> BRYCE WAYNE BENTLEY and JAY PERKINS, <br><br> Defendants. | No. C16-2105-LTS <br><br> **ORDER** |

## I.  INTRODUCTION

This case is before me on a motion (Doc. No. 17) for partial summary judgment by plaintiff Kendell Kay Canny (Canny) and a motion (Doc. No. 18) for summary judgment by defendants Bryce Wayne Bentley (Bentley) and Jay Perkins (Perkins). Each side has filed a resistance (Doc. Nos. 19 and 22) and a reply (Doc. Nos. 23 and 24). I find that oral argument is not necessary. *See* Local Rule 7(c).

## II.  RELEVANT FACTS

The following facts are undisputed except where noted otherwise:

This case arises out of the attempted execution of an arrest warrant for Canny's son, Kelly Lohrer (Lohrer), on September 5, 2014. At 1:22 a.m., Buchanan County deputies and Oelwein police officer Brandon DeJong (DeJong) attempted to execute the warrant at Canny's residence – 408 Second Avenue NE, Oelwein, Iowa. They checked the license plates of the two cars at the residence and determined they were both registered to Canny. They knocked at the front door, but nobody answered. They were unsuccessful in locating Lohrer at this point.

Approximately 21 hours later, at 10:19 p.m., Oelwein police officers Bentley, Perkins and DeJong returned to Canny's residence. Defendants contend the Oelwein Police Department had information that Lohrer lived at, or was present at, Canny's residence that day. Canny disputes that they had such information. A call for service record shows a wanted person record was pulled up at 22:18:57, on September 5, 2014, listing Lohrer's address as 109 Sixth Avenue, Oelwein, Iowa. Bentley believed the police department had received a phone call that Lohrer might be staying at his mother's house or had been observed there. Doc. No. 22-3 at 62. He could not identify the source of this information, but testified:

> It was my understanding that he was living there and kind of floating from house to house, residence to residence. I had had dealings with him at another residence. I believe it was his girlfriend Katie, I think. That he was living there but not living there. I don't know – it seemed to me like he floated from residence to residence.

*Id.* Bentley explained that officers were keeping an eye on Katie's house, Lohrer's sister's house and Canny's house hoping to catch Lohrer in between. *Id.* DeJong testified that he was probably "going off of the information [he] was given by Buchanan County earlier in the day" in deciding to look for Lohrer at Canny's residence. *See* Doc. No. 22-3 at 76. However, he could not recall what specific information Buchanan County deputies had or who had provided it. Doc. No. 17-3 at 53. Perkins relied on Bentley's belief that Lohrer was at Canny's residence and did not have any personal knowledge of Lohrer's whereabouts. *See* Doc. No. 22-3 at 12.

Lohrer was in fact at Canny's residence approximately three hours before the officers arrived. Canny argues the defendants were not aware of that fact. Lohrer had been residing with his sister, Brianne Lohrer (Brianne), at 109 Sixth Avenue SE in Oelwein. This was the address Lohrer provided to his probation officer. Brianne lived there with her boyfriend, Matthew Winter (Winter), and Winter's mother, Lisa Winter (Lisa). Brianne had contacted Lohrer's probation officer on September 5, 2014, to report

2

that she believed Lohrer had been using drugs.

Brianne and Winter had followed Lohrer to Canny's house the evening of September 5. Brianne told Winter to call the police when Lohrer became argumentative. Winter called his mother and asked her to call the police for extra patrol around their house at 109 Sixth Avenue SE. Lisa made the call at 9:34 p.m. The dispatch for that activity log states: "Lisa Winter 109 6th Ave SE . . . asking for extra patrol tonight as Kelly Lohrer is high again and is out of his minds (sic) – concerned he will return to their house tonight – advised officers." Doc. No. 17-3 at 69.

When the officers arrived at Canny's residence at 10:19 p.m., Bentley went to the front door of the home while DeJong and Perkins went to the back of the property. All of the blinds were drawn on the windows. Without knocking, Bentley opened the front screen door and peered inside the house. Bentley states he did this so that (1) he would know which way the inside door opened so somebody could not hide around the corner from him and (2) to make sure Lohrer was not sitting in the living room. A curtain covered the front door, but Bentley could see into the living room by peering through a gap between the curtain and the door. Defendants contend the gap was one to two inches wide. Canny states the gap was smaller (½ inch to ¾ inch) and points out that Bentley had to lean over the threshold of the door to peer through the gap in the curtain. In any event, Bentley testified that plaintiff's exhibits 6 (taken at night) and 7 (taken at day) accurately depict the gap. *See* Doc. No. 17-3



3

at 26-27.

*Id.* at 85-86. Peering through the gap in the curtain, Bentley could see an unknown male seated inside the residence, later identified as Winter. Bentley observed Winter pack a pipe and smoke its contents. After inhaling, he coughed violently. Bentley believed this was consistent with someone smoking marijuana.

Bentley radioed for Perkins to come to the front of the house and had Perkins observe Winter inside the home the same way he had done. The officers then knocked on the door. Canny opened the door at which point the officers could smell marijuana. They entered the premises and asked where the marijuana was. Brianne handed a bag of marijuana to Bentley. Bentley questioned Winter and Winter gave the pipe to Bentley. Canny then gave the officers consent to check the rest of the house for Lohrer. Lohrer was not in the home. Winter was taken into custody.

On September 10, 2014, Bentley instructed Canny to turn herself into the police station or she would be arrested. Canny appeared at the police station where she was taken into custody and charged with gathering where controlled substances are used in violation of Iowa Code § 124.407, a serious misdemeanor. She was later released.

At the time of this incident, Canny worked at the Oelwein Community School District and was placed on paid administrative leave. She resigned and entered into a separation agreement with the school shortly thereafter. On December 17, 2014, the Fayette County Attorney filed a motion to dismiss the charge against Canny, which was granted. She filed her complaint in this court on September 2, 2016, alleging defendants violated her constitutional right against unreasonable search and seizure under the Fourth Amendment by entering the curtilage of her home and engaging in surveillance of the interior of her home.

## III.   ANALYSIS

### A.   *Summary Judgment Standards*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of

a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

### B. *The Parties' Arguments*

Defendants argue they are entitled to summary judgment for three reasons:

1. There was no violation of Canny's Fourth Amendment rights.

2. Defendants are entitled to qualified immunity.

3. There is no evidence from which a reasonable jury could find that defendants acted with evil motive or intent, or reckless indifference to Canny's federally protected rights to support a claim for punitive damages.

6

Canny seeks summary judgment on liability only – whether defendants violated her Fourth Amendment rights. Because both sides argue they are entitled to summary judgment on this issue, I will address it first.

### 1. Was There a Fourth Amendment Violation?
#### a. Defendants' Motion

Defendants argue there was no Fourth Amendment violation because the officers were permitted to approach the home and, in doing so, they observed a crime in plain view. They argue that it is immaterial that they had to peer through the gap in the curtain in order to make this observation. Defendants also argue the search was justified under an "officer safety" exception.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The area "immediately surrounding and associated with the home," otherwise referred to as the "curtilage" is regarded as "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). The Supreme Court has acknowledged that "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.* at 7. It also acknowledged that there is an implicit license for a visitor to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8. Therefore, officers without a warrant "may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). This is sometimes referred to as a "knock and talk."

The question presented here is whether the officers exceeded the permissible license by opening the front screen door but, instead of knocking, leaning over the threshold and peering between the gap in the curtain on the front door to observe the

occupants inside Canny's home. Under *Jardines*, the obvious answer appears to be "yes," as instead of a "knock and talk," the officers executed a "lurk and spy." As noted above, however, defendants argue that their conduct was justified under two exceptions: the plain view exception and an officer safety exception.[1] They also argue they had a right to enter the house upon smelling marijuana when Canny answered the door.

"Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Class*, 883 F.3d 734, 737 (8th Cir. 2018) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). Canny argues the officers in this case were not "lawfully in a position from which [to] view the object." *See United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010). The Eighth Circuit has stated that "an officer's ability to observe through open windows what happens inside a home does not altogether extinguish the homeowner's otherwise reasonable expectation of privacy in the home itself." *United States v. Wells*, 648 F.3d 671, 678 (8th Cir. 2011). Officers are still required to obtain a warrant when viewing inside the window of a home, absent exigent circumstances. *See id.* ("Not even probable cause, absent an exigent circumstance, would permit an officer to enter that home without a warrant to make an arrest or seize contraband."). "That a homeowner exposes some portion of his dwelling to public view is not a license for officers to treat it as public space." *Id.*

---

[1] Notably, defendants do not rely on the arrest warrant as a justification for the search. *See* Doc. No. 23 at 2 (in which defendants state "it is undisputed in this case that the officers did not rely on the arrest warrant to enter plaintiff's home."); Doc. No. 22-3 at 65 (in which Bentley testified "I didn't go in because of the warrant because I didn't know he was there."). While both of these statements address the entrance into the home rather than the search by peering through the gap in the curtain, defendants do not make any argument that the arrest warrant justified either act.

Here, the officers were not viewing the inside of Canny's home from a public vantage point such as a street or sidewalk.[2] Rather, they had approached the front door and peered through a gap in the curtain over the door. While the law recognizes an implicit license to approach the front door of a home to conduct a "knock and talk," it does not recognize a license to linger there and surreptitiously surveil the home's occupants. *See Jardines*, 569 U.S. at 9 ("[t]he scope of a license – express or implied – is limited not only to a particular area but also to a specific purpose . . . [h]ere, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.").

The Eighth Circuit has stated that it is "not prepared to extend the 'knock-and-talk' rule to situations in which the police forgo the knock at the front door and, without any reason to believe the homeowner will be found there, proceed directly to the backyard." *Wells*, 648 F.3d at 680. Similarly here, the officers did not first attempt a "knock and talk" prior to engaging in a more intrusive search by peering through the gap in the curtain on the door. *Compare United States v. Raines*, 243 F.3d 419, 420-21 (8th Cir. 2001) (finding no Fourth Amendment violation where officer conducted a knock and talk at front door with no response, and, upon seeing several cars in the driveway, passed through an ungated, ten-foot-wide opening in a make-shift fence to the back yard), *United States v. Robbins*, 682 F.3d 1111, 1116 (8th Cir. 2012) (finding no Fourth Amendment violation where officers first attempted to reach the homeowner at the front door and only after receiving no response, conducted a short, minimally intrusive exterior perimeter search and glance at the windows). Both *Jardines* and *Wells* make it clear that officers are permitted to approach the front door of a home to attempt a knock and talk. In the

---

[2] The cases cited by defendants – *United States v. Conner*, 948 F. Supp. 821, 838 (N.D. Iowa 1996), *aff'd*, 127 F.3d 663 (8th Cir. 1997), and *United States v. Mathias*, 721 F.3d 952 (8th Cir. 2013) – can be distinguished on this fact alone. The other cases cited by defendants including *Martin v. State*, 297 P.3d 896, 899 (Alaska Ct. App. 2013) (and the cases cited therein), are primarily state court cases (which may have different standards under their state constitutions) or are over 20 years old and, thus, do not apply current Fourth Amendment law.

absence of a knock or an answer to a knock, lingering near the front door and peering through a gap in the curtain to see inside exceeds the scope of the implicit license and purpose discussed in *Jardines*. As such, I find that defendants are not entitled to summary judgment based on the plain view exception. A reasonable jury could conclude the officers were not in a lawful position when they made the observation of Winter smoking a pipe.

Defendants next argue the search was reasonable based on officer safety. They argue that Bentley was looking through the gap in the curtain to determine if he could identify the subject of the search warrant because a subject will sometimes take off and hide upon the officer's knock at the door. Canny points out that Bentley admits he had prior dealings with Lohrer and that Lohrer had never been violent towards Bentley. *See* Doc. No. 23-1 at 19. Bentley also could not identify anything specific about Canny's home that caused him concern based on the circumstances. *Id*. In addition, Canny argues that application of an officer safety exception under these circumstances would swallow the rule because there is always a safety risk when attempting to make an arrest. Canny relies on well-established law that "[i]f officers wish to execute an arrest warrant not at the person's home, but at a different person's home" they "must either obtain a search warrant for the other person's home or have exigent circumstances or consent to search." *United States v. Glover*, 746 F.3d 369, 373 (8th Cir. 2014).

An "objectively reasonable belief of a threat to officer safety" may justify a warrantless entry or search. *See United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (citing *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003)). "Exigent circumstances exist where law enforcement officers have a 'legitimate concern for themselves or others.'" *Kuenstler*, 325 F.3d at 1021 (quoting *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995) (internal quotation marks omitted)). "The analysis of whether this exception to the warrant requirement has been made out is an objective one 'focusing on what a reasonable, experienced police officer would believe.'" *Id*. (quoting

10

*In re Sealed Case 96-3167*, 153 F.3d 759, 766 (D.C. Cir. 1998) (internal quotation marks omitted)). "If officers have an objectively reasonable basis that some immediate act is required to preserve the safety of others or themselves, they do not also need probable cause." *Quarterman*, 877 F.3d at 800.

When viewing the facts in the light most favorable to Canny, I find that a reasonable jury could conclude that the circumstances did not justify the warrantless search and entry based on the officer safety exception. Indeed, defendants admit that Lohrer had never been violent and they were attempting to arrest him based on a non-violent probation violation. The Eighth Circuit has found the officer safety exception applies to warrantless searches or entries under limited circumstances. *See Quarterman*, 877 F.3d at 796 (responding to a report of domestic violence with a weapon involved), *United States v. Chipps*, 410 F.3d 438, 442 (8th Cir. 2005) (responding to an assault that occurred at defendant's home and observing blood just outside the home), *United States v. Walsh*, 299 F.3d 729, 733-34 (8th Cir. 2002) (warrantless search justified where officers smelled ether and observed equipment and residue outside the searched premises consistent with manufacturing methamphetamine and were concerned about risk of fire or explosion). *But see United States v. Murphy*, 69 F.3d 237, 243 (8th Cir. 1995) ("[A] reasonable belief that firearms may have been within the residence, standing alone, is clearly insufficient to justify excusing the knock and announce requirement." (internal quotation marks omitted)), *Smith v. Kansas City Police Dept.*, 586 F.3d 576, 580 (8th Cir. 2009) (finding no exigent circumstances based solely on fact that a domestic violence suspect was inside the home with a child). While this is not an exclusive list of possible exigencies, the circumstances in this case fall well below the threshold of an arguable officer safety risk such that a reasonable jury could conclude this exception does not apply. Defendants are not entitled to summary judgment on this basis.

Defendants' final argument is that they had a right to enter upon observing Winter pack a pipe, ignite it and cough violently followed by the smell of marijuana after Canny

answered the officers' knock at the door. While entry to the home may have been justified if the observations were made from a lawful position (which a reasonable jury could easily find they were not), these observations did not justify the initial search into the home by peering through the gap in the curtain over the front door. Indeed, the observations are the product of that search, of which defendants have not identified any applicable exception supported by the record. As such, defendants have not demonstrated they are entitled to judgment as a matter of law on the issue of whether there was a Fourth Amendment violation.

### b. *Canny's Motion*

With regard to Canny's motion, I must view the facts in the light most favorable to defendants. Canny brings her claim under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." The "essential elements of a § 1983 claim are: (1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *Kuha v. City of Minnetonka*, 365 F.3d 590, 606 (8th Cir. 2003), *abrogated on other grounds by Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007). Canny's claim is based on an alleged violation of her Fourth Amendment right to be free from unreasonable search.

Defendants rely on the same exceptions in arguing there was no Fourth Amendment violation: plain view and officer safety. The facts surrounding these alleged justifications are not in dispute. Even when viewing these facts in the light most favorable to defendants, I find that a reasonable jury could not conclude that the search was justified under the plain view or officer safety exceptions to the warrant requirement. Defendants

12

have provided no facts from which a reasonable jury could conclude, under current Fourth Amendment law, that they were in a lawful position when they peered through the gap in the curtain over the front door. Defendants also have not identified facts from which a jury could conclude that a reasonable, experienced police officer had reason to believe that the situation presented an officer safety risk such that it was necessary to peer through the gap in the curtain.

In short, the undisputed facts clearly make out a Fourth Amendment violation and do not support either the plain view or officer safety exception. Therefore, I find that Canny is entitled to summary judgment regarding the liability aspect of her claim for a Fourth Amendment violation unless defendants are entitled to qualified immunity.

## C. *Qualified Immunity*

Qualified immunity shields a government official from individual liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004). "The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis*, 375 F.3d at 711-12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). To determine whether defendants are entitled to qualified immunity, courts ask (1) whether the facts alleged or shown, construed in the light most favorable to Canny, establish a violation of a constitutional or statutory right, and (2) whether that constitutional right was clearly established as of the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Unless the answer to both of these questions is yes, the defendants are

entitled to qualified immunity. *See Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013).

Based on the analysis above, there was a constitutional violation when viewing the facts in the light most favorable to Canny. *See Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (explaining the initial inquiry as "whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional … right"). Therefore, whether defendants are entitled to qualified immunity depends on whether the constitutional right was clearly established as of the time of the violation.

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016) (quoting *Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014)). "Because qualified immunity protects officials who make bad guesses in gray areas, it gives them breathing room to make reasonable but mistaken judgments." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018) (internal citation omitted). "What is 'clearly established law should not be defined at a high level of generality . . . [but] must be particularized to the facts of the case.'" *Frederick v. Motsinger*, 873 F.3d 641, 647 (8th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "The pertinent inquiry is whether the state of the law at the time gave the official 'fair warning' that such conduct was unlawful in the situation he confronted." *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As applied here, the appropriate inquiry is whether a reasonable officer would have understood that entering the front porch of a home and, without knocking, peering through a gap in the curtain on the front door to observe the occupants inside violates the homeowner's constitutional rights.

Canny argues it is clearly established that defendants' conduct was unconstitutional based on *Jardines*. I agree. *Jardines* was decided on March 26, 2013. This search

14

occurred nearly 18 months later, on September 5, 2014. While *Jardines* addressed the constitutionality of a search via dog sniff near a resident's front door, *see Jardines*, 569 U.S. at 3-4, the same analysis applies to a search via officers peering between a gap in the curtain on the front door. *See Jardines*, 569 U.S. at 9 ("Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search."). *See also Ancona v. Samsel*, No. 3:16-CV-172 (MPS), 2017 WL 4765641, at *5 (D. Conn. Oct. 20, 2017) ("At least since *Jardines*, the law has been clearly established that – absent a warrant or exigent circumstances – an officer may use a clearly-marked path to the entrance of a private home and knock and wait briefly for an answer, but may not exceed the limits of that public license."). While neither the Eighth Circuit Court of Appeals nor the United States Supreme Court has had the opportunity to review a case containing facts identical to the ones here, the *Jardines* holding is specific enough for a reasonable officer to understand that lingering around a person's front door without knocking and surreptitiously observing the occupants inside the home through a gap in a curtain is unconstitutional. *See Jardines*, 569 U.S. at 8 (discussing that there is an implicit license for a visitor to "approach the home by the front path, *knock promptly*, wait briefly to be received, and then (*absent invitation to linger longer*) leave.") (emphasis added). Defendants' conduct falls outside the scope of this license, the scope of which was clearly established in *Jardines*.

To give the defendants the benefit of qualified immunity in this case, I would have to find that as of September 2014, a homeowner did not have a clearly established right to avoid having government agents lurk within the curtilage of the home, *without a warrant*, and spy inside through the curtains or shades. Because such a finding would be contrary to Supreme Court precedent (and, frankly, common sense), defendants are not entitled to summary judgment based on qualified immunity.

*D.     Punitive Damages*

Defendants argue that the record contains no evidence from which a reasonable jury could make an award for punitive damages under either federal or state law. "Punitive damages are appropriate in a § 1983 case when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997) (internal quotation marks omitted). Canny argues that genuine issues of material fact preclude summary judgment on this issue. She relies on the following facts:

- the officers made no effort to confirm or deny that Lohrer could be found at Canny's house

- the officers ignored the warrant information given by dispatch and the call for service from Winter's mother

- the officers did not check with Lohrer's probation officer to look to determine if any car associated with Lohrer was parked outside Canny's home

*See* Doc. No. 22 at 20. Canny argues that a jury should determine whether these facts amount to deliberate ignorance that would justify an award of punitive damages.

Defendants rely primarily on state law to argue they are entitled to summary judgment on this issue. While they acknowledge the federal standard for punitive damages in a § 1983 cases, they do not explain why they are entitled to summary judgment under that standard.

In any event, I find that there are facts from which a reasonable jury could conclude that defendants' conduct involves reckless or callous indifference to Canny's constitutional rights. Summary judgment on Canny's punitive damages claim is denied.

## IV. CONCLUSION

For the reasons stated herein, plaintiff's motion (Doc. No. 17) for partial summary judgment is **granted** as to liability and defendants' motion (Doc. No. 18) for summary judgment is **denied**. This case will proceed to trial as scheduled on September 17, 2018, on the issue of damages (including punitive damages).

**IT IS SO ORDERED.**

**DATED** this 4th day of April, 2018.

_____
Leonard T. Strand, Chief Judge